MaddeN, Judge,
dissenting:
I think the Government’s structure did not infringe the plaintiff’s patent. The essence of the plaintiff’s discovery is that cell-concrete, though necessarily weaker than ordinary structural concrete, may, if mixed in the right proportions, be light enough to be a good insulating material, but heavy enough to bear the weight of the pipe without being crushed by that weight. The plaintiff’s discovery thus makes it possible to eliminate the metal roller or rocker supports for the pipe which were thought to be necessary when the pipes were surrounded by a light substance such as mineral wool or cell-concrete.
The court’s opinion says that there was skepticism in the trade as to whether the plaintiff’s discovery was practicable, i. e., whether if the cell-concrete was really made light enough to make good insulation, it would bear the weight of the pipes without crushing. If the Government’s installation operates satisfactorily for 100 years, it will still prove nothing as to the practicability of the plaintiff’s device. In it, the cell-concrete around the pipes does not bear the weight of the pipes. The pipes are rested on pre-cast structural concrete blocks at intervals of not more than ten feet. The opinion of the court speaks of these blocks as temporary supports. I see nothing temporary about them. They supported the pipe when it had nothing else around it but air; they would continue to support it if it had nothing else around it but mineral wool or saw-dust. When the cell-concrete was poured, the hard concrete blocks were embedded in it and will always be there. If the skeptics should, after all, turn out to be right, and installations resting only on cell-concrete should fail, after years of use, the Government’s structure will not fail, because the pipes do not rest on the cell-concrete. They are merely surrounded by it. The most that can be said is that they would rest on it if they did not rest on something else, which they do rest on.
The decision of the court seems to me to say that if there is an old, unpatented method of accomplishing a result, and a new, patented method, one is guilty of infringement if he continues to use the old method when, in the opinion of the *125 patentee and the court, he could have accomplished the result by using the new method. If that is infringement at all it should be designated as constructive infringement, infringement not by use of the patented method, but by resort to a legal fiction. I see no good reason for resort to the fiction.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Donald E. Lane, and the briefs and arguments of counsel, makes findings of fact as follows:
1. This is a patent suit arising under the provisions of 28 U. S. C. § 1498 for the alleged infringement of United States Letters Patent No. 2,355,966, issued to Universal Zonolite Insulation Company on August 15, 1944, on an application for patent filed May 20, 1942, by David C. Goff. The Universal Zonolite Insulation Company, a Montana corporation, by amendment of its articles of incorporation, changed its name to Zonolite Company on December 18, 1947. Plaintiff Zonolite Company has been the owner of legal title in and to said patent in suit since said date of issue. Plaintiff Insulating Concrete Corporation, a Virginia corporation, is exclusive licensee under said patent for a territory including the place at which the alleged infringement occurred, namely, McGuire Air Force Base, Wrights-town, New Jersey.
2. The parties agreed at pretrial to a separation of issues for trial, and that the issues of validity of the patent and of infringement of the patent by the defendant be first determined upon full proofs, findings of fact, and argument of counsel. The two plaintiffs were represented at the trial by the same attorney.
3. The general subject matter of this suit relates to underground insulated pipe systems for conveying heated fluids, generally steam or hot water, between a boiler plant and other buildings in which the fluids are to be utilized for heating or the like. To be satisfactory for such use, underground insulated pipe systems should insulate the pipes against heat loss, protect the pipes from physical damage by external forces, permit the pipes to expand and contract in *126 response to changes in the fluid temperatures, and should protect the pipes against external moisture and corrosion.
THE PATENT IN STOT
4. The patent in suit, No. 2,355,966, hereinafter referred to as the Goff patent, discloses in its specifications an underground insulated pipe system, and includes drawings illustrating embodiments of the invention. The Goff specifications state:
* * * the present invention involves the employment of a new type of light-weight heat-insulating concrete, which permits of an improved outstanding procedure and substantially better resulting structure, such concrete including a light-weight aggregate — expanded-vermiculite — which possesses properties unusually well qualifying it for the purpose indicated.
Whereas the proportions of the ingredients of such light-weight heat-insulating concrete may vary as circumstances indicate, a suitable mixture for use under ordinary conditions would be 1 bag of Portland cement (about 94 pounds), 8 cubic-feet of expanded-vermiculite (minus 10 plus 65 mesh), 7 quarts of Admix and 26 gallons of water; such Admix comprising a suitable asphalt-emulsion, * * *
The novel heat-insulating system is unique in that the thus formed insulation is poured monolithically around the pipe or pipes which are to convey the heated fluid or to conduct the returning condensed steam, for example, and, in this way, the hollow clay-tile, or metal-casing conduit, with its tendency to breaks and the essential joints and costly laborious methods of installation are eliminated, the new concrete being poured around the one or more pipes and allowed to dry, whereupon the entire surface thereof is waterproofed as by 15 pound felts and pitch or asphalt.
*****
This insulating-concrete has sufficient structural strength that pipes may be embedded within the mass and their position maintained thereby indefinitely without the use of pipe roller or rocker supports, although these may be employed if desired.
The special properties of the new concrete affords [sic] the mass great elasticity, workability, and plasticity, and, in addition, tests show that it can be subjected to a 100 cycle of freezing and thawing without *127 breaking np, cracking or disintegrating; the insulating-concrete is not hard and brittle; and it will stand much abuse without fracturing or rupturing.
The specified new heat-insulating concrete is more or less water-repellent and has low capillarity, several tests showing that when it is exposed to water continuously for 200 hours, the penetration is less than 1 inch, * * *
This insulating-concrete is permanent, its basic element being exfoliated or expanded vermiculite, the chemical properties of which are alumina, silica and magnesium; it is incorganic [sic], inert and non-corrosive, the binder employed being likewise inorganic and inactive, and consequently there is no deterioration, rotting, moulding or disintegration.
Furthermore, such concrete is fireproof and will safely withstand temperatures up to 1000° F. with the standard binder, whereas the expanded-vermiculite aggregate used in the concrete will withstand temperatures up to approximately 2400° F.
Again, the concrete being inert, it has no effect on the electric-wires or conduits within itself or with which it comes into contact.
The density of such concrete is approximately 23 pounds per cubic-foot, which indicates that at no time is its weight in any way a detrimental factor.
Any number of pipes may be insulated in one operation, the concrete having a good slip and hence flowing completely around a multiplicity of pipes with no tamping and with a minimum of vibration.
The commonly-used loop-type of expansion is provided for in the system by the use of a simple pocket which allows the pipe or pipes to slide back and forth as they contract and expand. In the sleeve, or piston, type of pipe expanders, an insulating cement of Zonolite is used and the insulation is applied directly to the pipes, expanders, etc., in such type pit to a thickness of 2 inches to about 3 inches.
Functionally, the use of the new system of underground insulation will allow the entire system to operate at a high degree of efficiency.
Turning now to the accompanying drawings, present preferred embodiments of the current invention have been illustrated in detail therein to enable those acquainted with this art to readily understand the invention and the advantages and benefits accruing from its employment, and, for simplicity, like reference numerals have been used to designate the same parts throughout the several views. * * *
*128 5. The Goff patent drawings, illustrating the construction of an underground insulated pipe system embodying the principle of the invention in suit, are reproduced herewith. Figure 1 is a cross-section and fragmentary perspective view showing a trench 11 having a structural concrete base 12 laid on the floor of the trench. The base 12 is shown reinforced with lengthwise disposed rods 13. Figure 2 shows plies of asphalt-felt 14 covering the top of the base 12 and projecting beyond the sides of the base. The patent specifications state that the plies 14 are mopped to the base 12 and between the plies with hot asphalt. Figure 3 shows a steam pipe 15 and a return pipe 16 suspended above the base 12 by wires 17 and 18 attached to supports 19 resting on the ground and spaced along trench 11. Figure 4 shows paper tape 20 wound spirally on pipe 15 before the pipe is positioned as shown in Figure 3. The specifications state that the paper 20 is to prevent bonding of concrete to the pipe and to allow space for linear slip or movement of the pipe in the concrete due to temperature expansion and contraction of the pipe. Figure 5 shows the location of form members 22 on supports 21 and braced against the sides of the trench 11. The projecting edges of the felt plies 14 are turned up along the inside surface of the members 22. Screeds or strips 24 extend along the upper edges of the members 22.
6. Figure 6 shows a wire-mesh reinforcement 23 surrounding but out of contact with the pipes 15 and 16, and shows heat-insulating, pipe-encasing concrete 25 filling the space between the base 12 and the form members 22, and having an arched upper surface. The Goff patent specifications state:
The body of light-weight, heat-insulating, pipe-encasing concrete 25 thus formed having been allowed to set, either with or without the aid of heat in one or more of the pipes, and, the pipe or pipes being now adequately supported by such concrete, the two wires 17 and 18 are cut at the surface of the concrete and such severed portions and their supports 19, 19 are removed, the form-members being also taken out of the trench.
Figure 7 shows the forms having been removed, plies of waterproofed asphalt-charged felt 26, with suitable overlaps, mopped to the surfaces of the two kinds of concrete from one side of the base 12 up over the corresponding side of the

*0

*129 insulating concrete 25 including the upturned portion of the felt 14, then over the top of the insulating concrete, and down the other side of the structure to the base 12. All surfaces of the insulating concrete 25 are thus waterproofed. Figure 8 shows the trench refilled with earth covering the insulated pipe system.
7. Figure 9 is similar to figure 5 but shows the pipes 15 and 16 resting upon spaced devices identified by the numeral 29. As shown in the illustration, the chair-like devices 29 include feet resting on the felt plies 14 on the base 12 and include curved saddles at the upper ends and in which the pipes 15 and 16 rest. Figure 10 is a horizontal sectional view showing expansion and contraction pipe loops 27 within a pocket 28, the pocket 28 being surrounded by insulating concrete 25 covered with waterproof felt 26. The specifications state that the expansion and contraction loops 27 are spaced at suitable intervals along the pipe system, such as 200 to 300 feet apart. A suitable composition of insulating concrete is noted in finding 4 above. The insulating concrete 25 is poured into the forms so as to extend monolithically from one such set of pipe loops to the next. Conventional roller or rocker pipe supports are not shown or required in the Goff patent construction.
THE PATENT CLAIMS IN SUIT
8. The plaintiffs rely upon claims 1, 2, 3, 5, 6, and 7 of the Goff patent. These claims read as follows:
1. In an underground heat-insulated pipe-system including a base and heat-insulated, fluid-conductive, ex-pandible and contractible pipe-means supported by said base and having expansion-and-contraction compensation-means at intervals along the length of the system, the novel combination of improvements of said base being of structural-concrete and said heat-insulation of said pipe-means being heat-insulating concrete completely and solidly enclosing and supporting said pipe-means solely on said concrete-base and constituting a monolithic embedment for said pipe-means from each said compensation-means to the next, said insulating-concrete weighing less than 50 pounds per cubic-foot, said pipe-system being capable of conveying fluid with a heat-differential of at least 150° F. without injury to the system.
*130 2. The novel combination of improvements set forth in claim 1 in which said insulating-concrete weighs approximately 23 pounds per cubic-foot.
3. The novel combination of improvements set forth in claim 1, in which said heat-insulating concrete has. as its aggregate expanded-vermiculite at least in major part.
5. The novel combination of improvements set forth in claim 1 including the additional novel improvement of a waterproof cover entirely encasing said heat-insulating concrete.
6. The novel combination of improvements set forth in claim 1 including the additional novel improvements of a layer of waterproof-material between said base and said heat-insulating concrete extending at least part way up the opposite side faces of said heat-insulating concrete and of a second layer of waterproof-material covering the top of said heat-insulating concrete and extending down the sides thereof.
7. The novel combination of improvements set forth in claim 1 including the additional novel improvements of said heat-insulating concrete having as its aggregate expanded-vermiculite at least in major part, a layer of waterproof-material between said base and said heat-insulating concrete extending at least part way up the opposite sides of said heat-insulating-concrete, and a second layer of waterproof-material covering the top of said heat-insulating concrete and extending down the sides thereof.
9. Claim 1 recites a combination of improvements in an underground heat-insulated pipe system having a base, pipe means, and compensation means at intervals. The combination of improvements specifices—
(a) said base being of structural concrete,
(b) said heat insulation of said pipe means being heat-insulating concrete,
(c) completely and solidly enclosing and supporting said pipe means solely on said concrete base,
(d) and constituting a monolithic embedment for said pipe means from each said compensation means to the next,
(e) said insulating concrete weighing less than 50 pounds per cubic foot,
(f) said pipe system being capable of conveying fluid with a heat differential of at least 150° F. without injury to the system.
*131 Defendant has urged that this claim language means that the pipes arre solely supported l>y an insulating concrete poured around them. The position of solely in the claim apparently means that the heat-insulating concrete is solely on the concrete hose. This latter interpretation does not rule out the possibility of there also being some other support for the pipe, such as the devices 29 illustrated in Figure 9.
10. The other claims in suit are based on claim 1 and are of narrower scope. Claim 2 specifies that the insulating-concrete weighs approximately 23 pounds per cubic foot. Claim 3 specifies that the insulating-concrete has as its aggregate expanded vermiculite at least in major part. Claim 5 specifies a waterproof cover entirely encasing the heat-insulating concrete. Claim 6 specifies a layer of waterproof material between the base and the insulating concrete and extending upward and a second layer of waterproof material covering the top and extending down the sides. Claim 7 specifies the additional features of both claims 3 and 6.
11. All of the patent claims in suit read on and are supported by the disclosures of the specifications and illustrations contained in the Goff patent. Goff does not claim to be the inventor of heat-insulating concrete per se.
12. The claims in suit were allowed by the Patent Office after an appeal hearing before and a decision by the Patent Office Board of Appeals. The patent examiner’s rejection of said claims on six prior patents and a prior publication was reversed by the Board. At the hearing before the Board of Appeals, the brief filed on behalf of Goff described the preferred operations involved in insulating underground pipe-lines in accordance with the invention. The description included the following paragraph:
(3) Precast heat-insulating concrete-blocks of suitable size and shape are next placed on the waterproofed base at appropriate spacings and the pipes are mounted on them so that they are usually set about 4 inches above the base, such precast blocks supporting the pipes in their entirety only until the heat-insulating concrete is poured around the pipes, when they are supported by the continuous embedment of such concrete throughout their entire length.
*132 The Goff patent file contains no statement by either the applicant for patent or the Patent Office Board of Appeals that the claims now in the patent were considered to be limited in scope to cover only systems utilizing the wire suspension form of pipe support. The prior art considered by the Patent Office required no such limitation of scope.
13. The Board of Appeals’ decision said:
The appealed claims have been broadly rejected upon the art and reasons of record, and the examiner’s answer refers to Office actions of November 3,1943 and December 16,1942 for further explanation of the grounds of rejection. In the action of December 16, 1942, the examiner rejected the claims then up for action as unpatentable over each of patents to Shepler, Emery, and Burke, as well as the publication “Electrical World”. In the action of November 3, 1943, it was stated that claim 38 is generally vague as to meaning.
On considering these grounds of rejection in connection with the discussion in the brief, it is our view that the present appealed claims are not properly rejected as being vague as to meaning. It appears that the form is somewhat the same type known as the Jepson type of claim, in which the preamble sets forth the background and general relation of the improvement, which in this case is that of the structure of steam conduits having-conventional expansion and contraction compensation stations or means at intervals, followed by a statement of the insulated conduit structure between. We find no fault with the definition of the heat insulated portions nor the form of the claim in respect to the definition or its relations. This ground of rejection is not affirmed.
Upon consideration of the prior art, it is clear that none of the citations discloses a structure that is fairly equivalent to that defined by the claims in the way of conduits completely and solidly enclosed in good heat insulating concrete together with the other details required by claim 38, and additional features added by the dependent claims. While Burke and the citation “Electric[al] World” suggest that pipes may be embedded in concrete, it is our opinion that these citations are not suggestive of applicant’s particular arrangement of elemente. The citations relate to embedded electrical conduits formed of paper impregnated with pitch and in apparently conventional concrete, which is not fairly heat insulating, such as that employed by applicant. This second ground of rejection is, accordingly, not affirmed.
*133 The decision of the examiner is reversed.
14. The Patent Office file shows that the present plaintiffs brought suit on the Goff patent in 1952 against Universal Insulation Company, and Raymond J. Walters and Joseph E. Walters, individually, and trading as William EL Walters & Sons, of Philadelphia. The suit was filed in the United States District Court for the Eastern District of Pennsylvania. The file shows that a consent judgment in favor of plaintiffs and granting injunction was filed therein on June 3,1952.
VALIDITY
15. The defendant contends that the Goff patent and claims in suit are invalid over the disclosures of eleven prior domestic and foreign patents and eight prior printed publications. The prior art relied upon by defendant is identified as follows:
UNITED STATES PATENTS
Shepler_ 394,620 1888
Linley_ 1,325, 024 1919
Babor, et al_ 1,693,015 1928
Powell_ 1, 797,443 1931
Beehtner_ 1, 830,253 1931
Denning_ 1,916,971 1933
Sucetti, et al_ 1,927,102 1933
Gysling-2, 081, 867 1937
Sucetti (filed July 30,1941) 2, 354,156 1944
BRITISH PATENTS
Illemann 120,691 1918
Bayer_ 203,718 1924
PRINTED PUBLICATIONS
Zonolite booklet “Cold Storage Insulation” — 1940.
“Vermiculite — Production and Marketing by the Zono-lite Company” by William S. Steele, in Vol. 109 A. I. M. M. E. — 1934.
“Underground Steam Main Conduits etc.” by Leven D. Gray, in Heating & Ventilating — June 1938.
“Design of Light-Weight Zonolite Concrete Mixes” by Gregory P. Tschebotareff, in Journal American Concrete Institute, February 1941.
“Cell-Concrete”, in General Catalog No. 35 American District Steam Company, December 1935.
“Zellenbeton ais hochwertiger Isolierstoff” by W. Luft in Zeitschrift des Vereines Deutscher Ingenieure, Berlin, Vol. 73, 1929.
*134 “Supljikavi Betón” in Gradevinski Vjesnik, Zagreb [Yugoslavia], February-March 1933.
“Cell Concrete” by It. M. Mullen in Proceedings of the National District Heating Association, Philadelphia, 1935.
Of all the prior art patents and publications relied upon by defendant in this action, none of them was cited and considered by either the primary examiner or Board of Appeals of the Patent Office except the patent to Shepler, No. 394,620, showing underground heat-pipe expansion loops to be broadly old.
16. The Shepler patent was specifically considered by the patent examiner and by the Patent Office Board of Appeals. Shepler discloses the prior use of expansion and contraction compensation means with straight runs of pipe therebetween. The Shepler pipe or conduit is for the distribution of natural gas under high pressure, and is surrounded by a larger pipe or chamber formed of glazed terra cotta or wood. The Shep-ler disclosure is not concerned with heat-insulating underground pipe systems and does not mention the use of heat-insulating concrete.
17. The Linley patent discloses a conduit construction having a steam pipe resting upon pipe supports anchored in pockets in the lower section of a two-part concrete conduit. Lin-ley shows a heat-insulating lining spaced away from the steam pipe and shows a layer of tar between the two parts of the conduit to waterproof the joint. The nature of the heat-insulating lining material is not disclosed.
18. The Babor et al. patent shows lightweight material containing zonolite, sometimes called vermiculite, molded in the form of bricks, slabs, or other shapes. The composition is said to have good heat-insulating and fire-resisting properties. Among the uses stated for the lightweight article disclosed is a covering for steam pipes, ammonia pipes, etc. The Babor et al. patent does not mention underground insulated pipe systems.
19. The Powell patent shows a monolithic underground pipe system utilizing mineral wool as heat insulation. The Powell construction provides a pipe surrounded by mineral wool which in turn is surrounded by a covering of asbestos or *135 roofing paper secured by spaced copper wires. A number of strips of asphaltic material applied to the paper covering space the pipe and mineral wool from metal ribs embedded in an all-enclosing concrete outer jacket. Drains are connected to the spaces between the paper covering and the concrete jacket. The pipe rests on rollers which permit the pipe to roll longitudinally thereon when the pipe expands and contracts.
20. The Bechtner patent discloses a composition comprising vermiculite, bentonite, and water, with or without additives such as magnesium oxide, asbestos, mineral wool, or mineral coloring matter. The composition is said to be of low conductivity for heat and sound, and adapted for use in refrigerators, walls, around pipes, under floors, and the like.
21. The Denning patent describes a cement resistant to high temperatures and containing a citrate, magnesium compounds, and particles of exfoliated vermiculite. The cement is said to be useful for making insulating concrete, blocks, pressed bricks, and refractory linings.
22. The Sucetti et al. patent describes an insulating material containing vermiculite and bentonite for use in wall constructions, automobile mufflers, or the like.
23. The Gysling patent shows a steam main construction, and figure 3 of this patent is reproduced herein. The Gysling construction includes a concrete base or slab reinforced by embedded rods 19. Metal supports 23, provided with openings 28 for a continuous longitudinal drain, support a tubular sheet metal jacket 30 and also support guides 46 having transverse cradle rollers 47 journalled thereon. The steam main 52 encased in corrugated paper 54 is supported on the metal rollers 47. A body of plastic material 55 is poured into the metal jacket 30 around the main 52. Each roller 47 is encased in a block of paraffin 53 to prevent the plastic material from contacting the roller. In use, steam melts the paraffin and the rollers are then free to carry the main 52 in its expanding and contracting motion. The Gysling specification states that the plastic material 55 surrounds the main 52 but has clearance of such a degree as not to interfere with the expansion and construction of the

*136

Gysling 2,081,867
main. It states that the material 54 provides a yieldable spacer between the body of the insulating material and the metal of the steam main. The specification describes the plastic or insulating material 55 as being of such a nature as to be porous and light after it has set, and that it can be formed of asbestos fibre, rock-wool, cellular concrete, or the like. The metal jacket 30 is embedded in reinforced structural concrete 88.
24. The Sucetti patent No. 2,354,156, issued to plaintiff Zonolite, describes the making of lightweight compositions containing vermiculite, cement, asphalt-emulsion, and water. The Sucetti composition is similar to the composition of lightweight heat-insulating concrete described in the Goff patent.
25. The British Illemann patent describes a non-conducting material for covering steam pipes, a porous material formed by treating calcined gypsum with an excess of water. *137 The product is described as air cell gypsum, and is said to contain an infinity of microscopic cells filled with still air.
26. The British Bayer patent describes a method of making porous building materials by the use of a mucilaginous foam-developing substance. The Bayer specification also mentions the production of cellular plaster and cellular asbestos compositions.
27. The Zonolite booklet on cold storage insulation describes the properties and uses of Zonolite or vermiculite insulating concrete. Various compositions for various densities, strengths and insulating values are disclosed. The booklet mentions uses such as cold storage room floors, block insulation, sectional pipe covering, combustion chambers, insulating and acoustical plasters and other products. The booklet does not refer to underground insulated pipe systems.
28. The Steele article on vermiculite describes the sources, composition and characteristics of vermiculite as well as its production, preparation and expansion. The article discloses many commercial applications for this material from the insulation of dry ice containers to the protection of the tops of open-hearth furnaces. It states that pipe covering, secondary refractory brick, and articles of many types were in the course of production in a dozen research laboratories in 1934.
29. The Gray article on underground steam main conduits in St. Louis describes the use in 1936 of cell-concrete to rein-sulate an underground main in which sectional pipe covering had been damaged by water. The cell-concrete was described as a lightweight cellular concrete made of neat Portland cement and foam, prepared on the job and poured into the conduit. The conduit reinsulated included a concrete base, brick side walls, and a concrete roof.
30. The Tschebotareff article discloses the design of lightweight concrete mixes containing Zonolite vermiculite, and states that such concretes have excellent thermic insulating properties. It mentions prefabricated units and also placing the mix m situ. The article does not refer to underground insulated pipe systems.
31. The catalog of the American District Steam Company published in 1935 describes Adsco cell-concrete as a new *138 insulating material for underground steam lines. This cell-concrete is described as concrete filled with small air cells produced by adding a foam to a mixture of neat Portland cement. The catalog states that the American District Heating Company is the sole licensee in the United States for the application of cell-concrete as an insulating medium for underground steam and hot water lines under patents controlled by the United States Gypsum Company. Said patents were not identified during the trial of this case. The catalog illustrations show Adsoo cell-concrete in a multicell tile conduit with a concrete top, show a cell-concrete installation partially completed with side forms positioned to receive the cell-concrete, and show an installation partially completed with cell-concrete poured around pipes located between conduit side walls. The catalog states that the pipes may be wound with corrugated paper to prevent bonding of the cell-concrete to the pipe.
32. The German Zeitschrift des Vereines 1929 article also mentions the use of cellular concrete as an insulating material for underground steam pipes. The constructions illustrated in cross-section show metal rollers under the pipes and show an outer jacket applied over the cellular concrete, the jacket including a concrete top slab and concrete side walls in one of the views.
33. The Yugoslavic Gradevinsld Vjesnik 1933 article also relates to the use of cellular concrete for insulating long-distance heating pipes. The article states that the pipes are wrapped in oiled paper and completely poured over with cellular concrete of .28 specific gravity, and that over the cellular concrete is placed a reinforced protective layer which is covered with asphalt.
34. The Mullen article in the 1935 proceedings of the National Disti’ict Heating Association also relates to cell-concrete and includes cross-section views similar to those in the German Zeitschrift article. Said illustrations with legends added are reproduced here. The Mullen article refers to the use in Europe of cell-concrete as an insulating material for steam and hot water pipes, and states that on underground installations the cell-concrete was poured in forms as ordinary concrete. The bibliography of the Mullen article contains a

*0

*139 published statement by Mr. Schulmeister, a witness for defendant, the statement reading:
* * * There are some factors in the construction of cell concrete that we haven’t had answered for us yet.
One .of these, particularly, is the movement of pipes in the turning on and turning off of steam. We tested a 16-inch line and we found that the vertical, the up and down movement (not the expansion — the vertical movement) of the pipe was as much as one inch in a yard. We can’t see yet how you can take care of that in this type of cell concrete construction. You are certainly going to have a moving of the pipe. If you have very much of that you are going to crush the concrete and therefore lose insulation.
In connection with this printed statement, however, Mr. Schulmeister testified as follows:
I think there must be some kind of a typographical error in that statement. These comments are off-the-floor comments, and it was customary up to a few years ago to publish them, but because of having so many errors in that type of statement, the National District Heating Association does not print any more comments unless they are prepared in written form. I notice this statement refers to a one-inch rise in one yard as the pipe moves upward, due to expansion, as you might expect, but that would be 33 inches in 100 feet, and that is almost unbelievable.
That is the only comment I have to make on that.
As can be seen from the above testimony, no explanatory statement was made by the witness with reference to the possibility of the movement' of the pipe crushing the concrete with a resulting loss in insulation. The substance of the printed statement must, therefore, be taken as true though qualified to the extent that the pipe does not move 33 inches in 100 feet.
35. Other prior art mentioned by the defendant at the trial but not mentioned in defendant’s requested findings of fact does not add materially to the art discussed in the preceding findings 15-34, inclusive.
36. The items noted in findings 18, 20, 21, 22, 24, 27, 28, and 30 relate to vermiculite as an ingredient of heat-insulating concrete. Plaintiffs do not contend that Goff invented *140 such, a heat-insulating concrete per se. The items noted show that the physical properties of heat-insulating concretes containing vermiculite were well known in the art prior to the filing of the Goff application for letters patent in 1942.
37. The prior art items noted in findings 23, 25, 26,29, and 31-34 inclusive relate to the use of cell-concrete, cellular concrete, or air cell gypsum as a heat-insulating material. The heat-insulating quality of cellular concretes is due to entrapped air forming dead air cells in the set material. Defendant’s witness, a cell-concrete contractor, testified that cell-concrete is formed by mixing soapsuds with water and cement. The density and compressive strength of set cellular concretes may be controlled by the mixing procedures. The prior art noted teaches that cell-concrete for heat-insulating underground pipes should be encased in a protective layer or jacket of reinforced structural concrete, tile, or the like. The cell-concrete contractor testified that it was 1953 when he first began installing cell-concrete without a protective structural encasement, as described in the Type W specifications in his 1953 bulletin, defendant’s exhibit 7, and that a current job at Beaufort, S. C., provides a concrete slab over the top of most of the cell-concrete conduits.
38. The items noted in findings 16, 17, and 19 relate to underground pipe systems. Shepler, considered by the Patent Office, shows expansion and contraction compensation means in an uninsulated high-pressure natural gas conduit supported on rollers. Linley teaches that a steam pipe should be mounted on pipe supports, that a relatively large space should be provided between the pipe and the heat-insulating lining, and that the pipe and insulating material should be encased within a two-part concrete conduit. Powell teaches that the steam pipe should be mounted on rollers, that the mineral wool heat-insulating material should be encased in paper and asphalt, and be further encased in a concrete outer jacket provided with longitudinal air ventilating and lower draining spaces with drains extending through the base. The Shepler, Linley, and Powell patents therefore teach the use of an outer full jacket of concrete or glazed terra cotta on underground pipe systems.
*141 39. Plaintiffs contend that in the Goff patent underground insulated pipe system, the heat insulation of the pipe is heat-insulating concrete completely and solidly enclosing and supporting the pipe solely on the structural concrete base and constituting a monolithic embedment for the pipe. Plaintiffs contend that the heat-insulating, pipe-encasing concrete 25, mentioned in finding 6, completely and solidly encloses and supports the pipes 15 and 16. Plaintiffs further contend that the Goff system supports the pipes against movement in any direction, up, down, or sideways, as distinguished from the Shepler, Linley, and Powell systems in which the pipe is merely supported by bottom side rollers to counteract the force of gravity. Steam pipes may tend to move in any direction when subjected to sudden changes in temperature caused by steam or condensate flow. The Goff patent construction having heat-insulating concrete completely and solidly enclosing and supporting the pipe does support the pipe against upward movement of the pipe of the character mentioned in finding 34 relating to the Mullen article. Plaintiffs’ above contentions are sound.
40. In the Goff patent system, before pouring the heat-insulating concrete around the pipes, the pipes may be supported against the pull of gravity by being suspended on wires attached to cross supports, or by being mounted on saddle-like devices, as shown in the patent drawings reproduced in finding 5. The use of precast heat-insulating concrete blocks to support the pipes until the heat-insulating concrete is poured, as mentioned in Goff’s brief on appeal noted in finding 12, is the equivalent of using the saddle-like devices 29 illustrated in Figure 9 of the Goff patent drawings. The poured heat-insulating concrete contacting the paper tape wound on the submerged pipes exerts a buoyant support on the pipes to counteract at least in part the force of gravity on the pipes. When the poured heat-insulating concrete has set and hardened, said insulating concrete provides support tending to restrict the movement of the pipes in all directions other than axially of the pipes. Axial movement of the pipes in the insulating concrete is permissible within limits provided by the expansion-contraction loops and conventional pipe anchor devices.
*142 41. The dictionary* definition of the verb “support” includes “to hold up or in position”, and “to bear the weight or stress of”. The adjective “monolithic” is defined as “constituting one massive undifferentiated whole, exhibiting solid uniformity and one harmonious pattern throughout.”
42. Plaintiff Insulating Concrete Corporation installed commercially a large quantity of “Z” Crete underground pipe insulation systems in the years 1943-1955 inclusive, the gross sales thereof totaling in excess of three million eight hundred thousand dollars. Said “Z” Crete systems are defined as including a base of structural concrete, a heat-insulated, fluid-conductive, expandable and contractible pipe supported by the base and having expansion and contraction compensation means at intervals along the length of the system, the heat insulation of said pipe being heat-insulating concrete completely and solidly enclosing and supporting said pipe solely on the concrete base and constituting a monolithic em-bedment for said pipe, the heat-insulating concrete weighing less than 50 pounds per cubic foot, and the system being constructed to convey fluid with a heat differential of at least 150° F. without injury to the system. Said “Z” Crete systems utilized insulating concrete which weighed approximately 23 pounds per cubic foot and which contained as its aggregate expanded vermiculite at least in major part, and included a waterproof cover entirely encasing the heat-insulating concrete. The commercially installed “Z” Crete underground pipe insulation systems embodied therein the several features recited in the Goff patent claims in suit. Most of the said commercially installed “Z” Crete systems provided for mounting the pipes on concrete blocks, rather than on saddle devices or suspended wires, during the pouring of the heat-insulating concrete around the pipes.
43. The invention recited in the Goff patent claims in suit is not disclosed in the prior art relied upon by the defendant, and was new at the time the Goff application for letters patent was filed. Said invention has been accorded extensive commercial success and is useful. The differences between the prior art and the subject matter recited in the claims in

*0

*143 suit are such that the claimed subject matter as a whole would not have been obvious, at the time the Goff application was filed, to a person' having ordinary skill in the art to which said subject matter pertains. The novel combination claimed produced unexpected and surprising results in that it was not previously disclosed that heat-insulating concrete could safely be used in an underground pipe system without a structural casing for its protection, or that heat-insulating concrete would support hot pipes against movements in non-axial directions, or that roller or rocker supports for the pipe are unnecessary in the claimed combination of elements.
44. Claims 1, 2, 3, 5, 6, and 1 of Goff patent No. 2,355,966 are valid over the prior art relied upon by the defendant.
ACCUSED INSTALLATION
45. The accused insulated underground pipe system was constructed for the defendant and was used by the defendant at McGuire Air Force Base, Wrightstown, New Jersey, within the 6-year period preceding the filing of this suit. Defendant and the contractors involved had notice of the rights claimed by plaintiffs under the patent in suit during the installation at the McGuire Base.
46. The accused system is shown in various stages of completion in a series of United States Air Force official photographs, plaintiff’s exhibits 1 to 9 inclusive. A portion of the accused system is illustrated diagrammatically in a sketch reproduced herein. Referring to the sketch, which shows in section a portion of the conduit system between expansion and contraction compensating loops, a reinforced structural concrete base was formed in the bottom of a trench dug in the earth. The base was laid to the desired grade and after the concrete had set, the top surface was waterproofed by the application of three layers of hot pitch and two layers of waterproof felt. These felts were cut off even with the lateral edges of the base. Precast structural concrete blocks were then set on the waterproofing on the base at intervals of about ten feet. Metal pipes for conducting steam or hot water were then positioned on the blocks and a single ply of corrugated paper was wrapped around each pipe. Forms were then erected on each side of the base and three layers *144 of waterproof felt with hot pitch between layers were laid against the inner sides of the forms. The bottom edges of the felts were turned inward to overlap marginal portions of the waterproofing on the base. Next, a slurry of insulating concrete was poured into the forms around the metal pipes to a depth extending about six inches above the upper surfaces of the metal pipes. The insulating concrete was a mixture of Portland cement, a vermiculite aggregate, a water-repellent admix, and water, said insulating concrete having a density of approximately 23 pounds per cubic foot when set. When the insulating concrete was set, the upper edges of the side felts lining the forms were folded toward one another on the top surface of the insulating concrete and mopped in place with hot pitch. In some instances the upper edges of the side felts extended far enough to overlap and complete the enclosure of the insulating concrete in waterproofing. In other instances where the side felts did not overlap, a cap or top sheet or sheets of felt were placed over the top of the insulating concrete and the edges turned downward to overlie the side waterproofing to complete the waterproof enclosure of the insulating concrete. After fine sand was poured around the conduit, the trench was backfilled with earth and tamped to compact the backfill.
47. The McGuire system described in finding 46 forms a monolithic embedment for the pipes from one expansion and contraction compensation loop to the next. At McGuire, the compensation loops were spaced at intervals of about 150 feet, and were similar in shape to the loop shown in Figure 10 of the Goff patent reproduced heretofore. The McGuire loops were encased in insulating concrete of about 18 pounds per cubic foot density, and said insulating concrete was encased within a structural concrete box. The accused installation was designed for conveying water at 400° F., and has been in satisfactory operation for over two years. The McGuire system has successfully withstood temperature differentials of at least 150° F. during its operation.
48. The McGuire underground insulated pipe system was installed under construction contract No. DA-36-109-eng-4918 between Charles Simkin & Sons, Inc., Hopelawn, New Jersey, hereinafter called Simkin, and the defendant, and *145 dated 14 August 1953. The underground system was actually installed by the Eichmond Asbestos Company, Queens, New York, a subcontractor. The subcontractor Eichmond employed Temp ‘O’ Crete International Corporation, New York, New York, as manufacturer’s representative, in accordance with a contract provision requiring such a representative to supervise the installation of the underground conduit. The contract required that the high temperature water lines be enclosed in conduit formed from a plastic mixture consisting of Portland cement, rock exploded into inert featherweight granulous minerals, an integral water-repellent admixture and water, all thoroughly and uniformly machine mixed. The contract provided that the basic ingredients of the mixture consist of the following proportions:
Portland cement_100 pounds
Aggregate- 8 cubic feet
Admix- 7 quarts
Water- 26 gallons
The contract provided that the insulating concrete so obtained have a density of approximately 23 pounds per cubic foot. The underground insulated pipe system installed at McGuire was installed in accordance with the provisions of said contract as amended.
49. The installation contract provided in paragraph j relating to the underground conduit that the pipe supports be placed not more than 10 feet apart and at each end of the conduit section and provided that said pipe supports should carry the weight of the pipe and assure proper alignment. Paragraph D originally provided that the pipe lines be properly supported on insulating blocks spaced as specified. On February 16, 1954, the contracting officer wrote to the contractor, Simkin, as follows:
Eeference is made to Article 25 of Contract No. DA 36-109-eng-4918, dated 8 September 1953, for Construction of Central Heating Plant, Distribution System and Equipment Eooms at McGuire Air Force Base, Wrights-town, New Jersey.
By letter dated 19 November 1953, addressed to you, Eichmond Asbestos Company, 54r-18 43rd Street, Long Island City, Queens, New York, in referring to the Zono-lite letter of 4 November 1953, stated that there is no *146 infringement of Zonolite Company’s patent, No. 2855966, for insulation of underground piping. _
_ While it may be a fact that the validity of the asserted patent has not been judicially determined, that does not bar the possibility of Zonolite Company’s initiation of a suit for patent infringement at this time. It is therefore requested that you obtain and forward to this office for consideration a full report (written opinion of counsel) as to the basis upon which Richmond Asbestos Company’s patent attorneys reach their conclusions as to noninfringement and invalidity of Zonolite Company’s patent. It is noted in this connection that there is considerable similarity between the proprietary construction claimed in the patent and the construction set forth in paragraph 23-13D of the contract.
Since this information is for submission to higher authority, it is requested that you obtain and furnish same as soon as possible.
On February 17, 1954, Richmond forwarded to Simkin, for approval, samples of concrete blocks to be used in the support of the pipes. On February 20, 1954, the resident engineer at McGuire Air Force Base advised Simkin that this type of support was approved subject to certain stated conditions. The installation at McGuire utilized the approved concrete block pipe supports as distinguished from the insulating blocks originally specified.
50. In seeking approval of its bid for a subcontract, Richmond forwarded to the defendant a copy of Temp ‘O’ Crete Underground Pipe Insulation sales literature, such as plaintiffs’ exhibit 42. This Temp ‘O’ Crete literature includes two drawings which are identical in many details with drawings contained in plaintiffs’ “Z” Crete sales literature published at least five years earlier, such as plaintiffs’ exhibit 81. The arrangement of dots and triangles to show structural concrete cross-section and to show insulating concrete cross-section in the Temp ‘O’ Crete literature is identical with that provided in the earlier “Z” Crete literature. The Temp ‘O’ Crete literature stated that the Temp ‘O’ Crete has a minimum compressive strength of 70 pounds per square inch when set. The earlier “Z” Crete literature, such as plaintiffs’ exhibit 33, stated that the insulating concrete should have a minimum compressive strength of approximately 70 pounds per square inch at the end of 28 days. *147 The president of Temp ‘O’ Crete International Corporation indicated on cross-examination that the plaintiffs’ “Z” Crete literature could have been copied in preparing the Temp ‘O’ Crete literature. Temp ‘O’ Crete employed an ex-employee of plaintiff Insulating Concrete Corporation as a supervisor on the McGuire job, and later this ex-employee was employed by Richmond on the McGuire job.
INKRIN CEMENT
51. The accused installation at McGuire Air Force Base and described in findings 45 to 49 inclusive infringes the claims in suit. The base at McGuire was structural concrete. The heat insulation of the pipe was heat-insulating concrete which completely and solidly enclosed and supported the pipe on the base. The heat-insulating concrete constituted a monolithic embedment for the pipe from each compensation loop to the next. The heat-insulating concrete weighed less than 50 pounds per cubic foot. The McGuire pipe system was capable of conveying fluid with a heat differential of at least 150° F. without injury to the system. The McGuire insulating concrete weighed approximately 23 pounds per cubic foot as recited in Goff claim 2, and had as its aggregate expanded vermiculite at least in major part as recited in claim 3. The McGuire system had a waterproof cover of felts and pitch entirely encasing the insulating concrete as recited in claim 5. The McGuire system included a layer of waterproof material between the structural concrete base and the insulating concrete and extending upward, and included a second layer of waterproof material covering the top of the insulating concrete and extending down the sides thereof, as recited in claim 6. The McGuire system included both the features of claim 3 and of claim 6, as recited in Goff claim 7.
52. All of the several claims in suit clearly read on and find accurate response in the underground insulated pipe system installed at McGuire Air Force Base under the construction contract identified in finding 48.
53. In some portions of the McGuire installation the underground insulated pipe system was enclosed in a structural concrete encasement, particularly in areas subject to traffic of relatively heavy automotive equipment. Where a *148 structural concrete encasement or where preformed vermiculite planks were used to enclose the heat-insulating concrete, there was no infringement of the Goff patent invention. The defendant was not authorized to utilize the Goff claimed invention at said Base.
54. In operation, the accused McGuire system is similar to that described in the Goff patent, uses equivalent structural elements, and secures the same desirable results in the same manner. The insulating concrete encloses and supports the pipe against movement in all directions other than axial movement. The insulating concrete is supported solely on the concrete base. The patent claims in suit are not limited in scope to the suspension wires or chair devices illustrated in the patent drawings to provide a support for the pipes against the downward pull of gravity during the conduit installation steps. "Whether said initial supports against gravity are wires, chairs, insulating concrete blocks, or structural concrete blocks, is not material in applying the patent claims. Such supports against the pull of gravity engage a relatively minor bottom surface area of each wrapped pipe, and after the heat-insulating concrete is set, the concrete engages all remaining areas of the embedded pipe to support the pipe against movement in all directions other than axial. During pouring of the insulating concrete around large diameter pipes, there is a buoyant support effect exerted on the pipes. Like the Goff patent system, the McGuire system did not require the use of conventional roller type supports. Defendant’s patent expert testified that the accused McGuire installation was probably closer to the Goff patent construction than to the prior art.
55. Claims 1, 2, 3, 5, 6, and 7 of Goff patent No. 2,355,966 are infringed by the accused McGuire Air Force Base underground insulated conduit system, and said claims are valid over the prior art relied upon by the defendant.
conclusion op law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the patent in suit is valid and that it was infringed upon by the defendant, and judgment will be entered to that *149 effect. The extent of liability will be determined in further proceedings before the Commissioner.

Webster’s New Collegiate Dictionary, Q. & C. Merriam Co., Copyright 1953 (emphasis added).